IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Judge Christine M. Arguello

Civil Action No. 21-cv-01350-CMA-KLM

SEELEY INTERNATIONAL PTY LTD,

    Plaintiff,

v.

VALERIY MAISOTSENKO, M-CYCLE INDUSTRIES, INC, and M-CYCLE CORPORATION, LTD,

    Defendants.

## ORDER DENYING MOTION FOR TEMPORARY RESTRAINING ORDER AND VACATING HEARING

This matter is before the Court on Plaintiff's Motion for Temporary Restraining Order (Doc. # 11). The Court has reviewed the voluminous briefing and exhibits submitted in support of and in opposition to the Motion for Temporary Restraining Order. It is apparent that Plaintiff's claims revolve around a relationship between the parties, the facts of which are very much in dispute. However, as described below, the documentation upon which this relationship is premised and, from which the defendants' obligations allegedly arise, are poorly drafted and unclear as to their applicability to Defendant Maisotsenko.

The Complaint and the Motion for TRO are similarly deficient. For example, with respect to the patent infringement claims, Seeley's allegations are vague and conclusory. Seeley vaguely alleges that it "owns multiple patents which comprise the

1

integral features and methodology of the M-Cycle," (Doc. # 11, ¶ 41) but it fails to identify which patents are at issue in this case. Instead, Seeley merely provides a list of patents it acquired when it purchased Coolerado. (Doc. # 11-2). Seeley fails to explain which of these patents relate to the M-Cycle, which are being used by Defendants, or how Defendants are infringing on these patents. Rather, Seeley simply alleges that Defendants are "distributing, marketing, and selling certain air-cooling systems that included and utilize the technology, methodology, and/or inventions related to the M-Cycle." (Doc. # 11, ¶ 48). Without more information, the Court cannot even determine which patent claims are at issue, let alone whether those claims are being infringed.

Similarly, with respect to its trade secrets claim, Seeley alleges that "[t]he M-Cycle is Seeley's Trade Secret," (Doc. #11, p. 18), which Defendants are using "to promote, produce, and distribute . . . air-conditioning products that directly compete with Seeley's products." (Doc. # 11, ¶ 43). However, Seeley also alleges that the M-Cycle has been patented, and information cannot be both secret and patented. "[P]atent laws impose upon the inventor a requirement of disclosure." *Kewanee Oil Co. v. Bicron Corp.*, 416 U.S. 470, 480 (1974). "Trade secret laws operate only to protect those ideas held in secret, while patent law affords the exclusive means of protecting the right to an invention only after it is disclosed to the public." *Russo v. Ballard Med. Prod.*, 550 F.3d 1004, 1011 (10th Cir. 2008). Thus, despite Seeley's argument to the contrary, none the information contained in Seeley's patents is entitled to trade-secret protection. Further, Seeley has failed to identify any unpatented information related to the M-Cycle that could be considered a trade secret. Seeley repeatedly states that Maisotsenko has

stolen its "confidential business information," but fails to explain what, exactly, has been stolen. Is it a customer list? A manufacturing process? A measurement technique? Seeley's factual allegations are too vague to allow the Court to discern what trade secrets – or even what categories of information – are at issue. (*See, e.g.* Doc. # 1, ¶ 26 ("Maisotsenko used his position as Chief Scientist with Seeley to develop, design, and ultimately steal trade secrets"); ¶ 23 ("Clearly, Maisotsenko has already disclosed Seeley's confidential trade secrets, intellectual property, and patented technology"); ¶ 24 ("Maisotsenko is currently . . . selling a competing air cooler . . . which implements the M-Cycle trade secrets and patented technology")). Seeley's conclusory allegations are not sufficient to survive a motion to dismiss, let alone establish a likelihood of success on the merits. *See, e.g. Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).

Finally, with respect to its claim for breach of contract, Seeley alleges that Maisotsenko signed an employment agreement with Seeley on August 17, 2015.[1] (Doc. # 1, ¶ 19). That agreement (Doc. # 11-5) contains a confidentiality clause and a non-competition clause, which prohibit Maisotsenko from (1) disclosing Seeley's trade secrets and confidential business information, and (2) working for a Seeley competitor for "twelve months from the date of [his] employment with the Company being terminated." (Doc. # 11-5, p. 7). Seeley alleges that Maisotsenko breached his

---

[1] The Court assumes, for purposes of this motion, that the employment contract is valid. The Court notes, however, that there are a number of reasons to doubt the authenticity and validity of the employment contract. For example, the contract is not signed by a Seeley representative; the executed signature page is not identical to the signature page contained at page 11 of the contract; the signature page is not dated; and the contract appears to have been signed by an employee whose name begins with the letter B, not by Valeriy Maisotsenko. (*See* Doc. # 11-6).

3

employment agreement by "continuously violat[ing] his confidentiality and non-compete obligations" and by stealing "Seeley's trade secrets and intellectual property related to the M-Cycle in order to unfairly compete with Seeley." (Doc. # 11, ¶ 17).

As stated above, however, Seeley has failed to allege facts which would establish that Maisotsenko did, in fact, steal Seeley's proprietary information. Seeley chooses instead to rely on assumptions and unsupported accusations. (*See, e.g.* Doc. # 11, ¶ 18 ("Clearly, Maisotsenko has already disclosed Seeley's confidential trade secrets")). Contrary to Seeley's assertions, it is far from clear that Maisotsenko or his companies have misappropriated Seeley's confidential business information. Therefore, it would be very difficult for this Court to conclude that this theory of breach has a "substantial likelihood of success on the merits," as is necessary for a temporary restraining order. *Kaplan v. Bank of N.Y. Mellon Trust Co.*, No. 10-cv-02802-PAB, 2010 WL 4775725, at *1 (D. Colo. 2010).

Next, Seeley has failed to establish that Maisotsenko is in breach of his non-competition agreement. The non-competition clause in Maisotsenko's contract provides that Maisotsenko is prohibited from working for a competing company for a period of twelve months following his departure from Seeley.[2] (Doc. # 11-5, § 11). But Seeley has not provided any evidence that Maisotsenko *did* work for a competing company during

---

[2] Seeley contends that Maisotsenko's noncompetition period was actually five years. (Doc. # 11, ¶ 29). This argument finds no support in the record. Maisotsenko's employment contract expressly states that the maximum noncompetition period is twelve months. (Doc. # 11-6, § 11). That contract expressly states: "This Agreement shall not be changed or modified in any way . . . except in writing signed by both you and [Seeley]." (Doc. # 11-6, § 14.2). Seeley has not provided any agreement signed by Maisotsenko that creates a five-year noncompetition period.

4

that period. Maisotsenko allegedly started working for Seeley on August 17, 2015 (Doc. # 11, ¶ 27), but Seeley provides no information about when Maistosenko left the company or when he started working for a competing company. Therefore, the Court has no basis to conclude that Maisotsenko began working for a competitor less than twelve months after leaving Seely.

A TRO is an extraordinary remedy designed to be used only when the moving party is about to suffer "immediate and irreparable harm." *Drive Sunshine Institute v. High Performance Transportation Enterprise*, 2014 WL4652020 (D. Colo., Sept. 19, 2014). In contrast to a preliminary injunction, a TRO provides urgent relief, sometimes even before the opposing party has received notice of the TRO motion. *Compare* F.R.C.P. 65(a) ("The court may issue a preliminary injunction only on notice to the adverse party.") *with* F.R.C.P. 65(b) ("The court may issue a temporary restraining order without written or oral notice to the adverse party . . . if . . . specific facts in an affidavit or verified complaint clearly show that immediate and irreparable injury, loss, or damage will result to the movant"). This Court determines that these issues are inappropriate for determination via a Motion for Temporary Restraining Order. Therefore, the Court DENIES the Motion for Temporary Restraining Order (Doc. # 11) and VACATES the TRO Motion Hearing set for June 9, 2021 at 9:00 AM.

If Plaintiff wishes to proceed with a Motion for Preliminary Injunction, Plaintiff shall have 30 days within which to file a Motion for Preliminary Injunction supported by thorough briefing which addresses the shortcomings set forth above. Defendants shall have 30 days from the filing of the Plaintiff's Motion to file a Response. Plaintiff shall

have 15 days from the filing of Defendant's Response to file its Reply. The Court will extend the page limits for the parties' briefing to 25 pages for the Motion and Response.[3] After briefing is completed, the parties shall contact Chambers at Arguello_Chambers@cod.uscourts.gov to set a hearing on the Motion.

DATED: June 8, 2021

BY THE COURT:

CHRISTINE M. ARGUELLO
United States District Judge

---

[3] Both sides ignored the Court's page limits in their initial briefing. The Court's Civil Practice Standards provide as follows: "Except for motions for summary judgment, all motions, objections (including objections to the recommendations or orders of United States Magistrate Judges), and responses shall not exceed 15 pages. Reply briefs shall not exceed 10 pages. These page limitations include the cover page, jurisdictional statement, statement of facts, procedural history, argument, authority, closing, and all other matters, except the signature block and certificate of service." Civil Practice Standards § 10.1(d)(1), *available at* http://www.cod.uscourts.gov/Portals/0/Documents/Judges/CMA/CMA_Civil_Practice_Standards.pdf. "Exceptions to the above page limitations will be granted only upon a showing of good cause. Permission to exceed the page limitation shall be sought by way of an appropriate motion filed well in advance of the deadline for filing the pleading and shall indicate the number of pages of the proposed document and the reason(s) why the additional pages are necessary." *Id*. at § 10.1(d)(3). The parties are instructed to familiarize themselves with the practice standards before filing additional briefing. Briefs that do not comply with the practice standards will be stricken.